FILED
CHARLOTTE, NC

# UNITED STATES DISTRICT COURT
for the
Western District of North Carolina

SEP 17 2019

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| United States of America<br>v.<br>HAL H. BROWN, JR.<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 3:19mj330<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __set forth in the attached Affidavit__ in the county of __BUNCOMBE__ in the __WESTERN__ District of __NORTH CAROLINA__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1957 | Money Laundering |

This criminal complaint is based on these facts:

Attached Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Jacob R. Guffey, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/17/2019

_____
*Judge's signature*

City and state: Charlotte, North Carolina

David C. Keesler, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR ARREST WARRANT

I, Jacob R. Guffey, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since 2008. As such, I am a "federal law enforcement officer" of the United States within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am currently assigned to the Charlotte Division, Hickory Resident Agency where my responsibilities have included investigating a variety of offenses, to include white-collar crimes.

2. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and criminal complaint charging HAL H. BROWN, JR. with wire fraud, in violation of Title 18, United States Code, Section 1343 and transactional money laundering in violation of Title 18, United States Code, Section 1957. As such, this Affidavit does not set forth all of my knowledge about this matter, nor is it intended to provide all of the information obtained in connection with the relevant investigation.

3. Your affiant submits that there is probable cause to believe that for at least the last several years to the present, while in the Western District of North Carolina and elsewhere, HAL H. BROWN, JR. did execute a "Ponzi" scheme to defraud multiple investors of over $10,000,000, and engaged in money laundering, through the use of various interstate wires. Victim 1 (V1), alone, invested or loaned nearly $5 million. BROWN recruited individuals to invest money in the OODLES COMPANY and its various affiliates (collectively, "OODLES"), for the stated purpose of facilitating the development and sale of intellectual property purportedly owned by OODLES.

Despite collecting over $10,000,000 based on such representations, BROWN does not appear to have conducted any sales of the intellectual property purportedly owned by OODLES. Rather, BROWN simply deposited the money in various bank accounts, withdrew new investor money to make Ponzi payments to old investors, and made a series of personal expenditures. BROWN concealed the scheme, among other ways, with false representations to investors and false account statements.

## The Scheme

4. BROWN, a resident of Asheville, North Carolina, represented himself to potential investors as the CEO of OODLES, which was purportedly involved in the ownership, production and distribution of intellectual properties, namely family entertainment shows and movies. BROWN claimed that he and OODLES had relationships with The Walt Disney Company (WDC), Paramount Pictures (Paramount), Apple Inc. (Apple) and other well-known media companies. BROWN also claimed that OODLES was involved in the production of first class family entertainment. Marketing material seeking investments for OODLES claimed large returns on funds invested into the company. BROWN and OODLES also claimed to have ownership of approximately 420 intellectual properties, which BROWN claimed were worth hundreds of millions of dollars.

5. In furtherance of his scheme and artifice to defraud, BROWN provided, among others, the following false and fraudulent misrepresentations, thereby causing victims to invest in his fraudulent scheme.

    a. On or about December 23, 2017, BROWN provided Victim 2 (V2) an email purported to be from "Carmen Demarco," and discussed an impending sale of various intellectual properties to Walt Disney Company involving the law firm Dentons. It stated, in part, "WDC has

agreed to purchase 48% of the available Class B Stock owned by the Oodles Family Company. As this stock is allocated, the full ownership of the collection of Intellectual Properties approved and cleared for sales by The Oodles Companies and all related unions and societies and guilds, worldwide, will be transferred to WDC and filed accordingly. ... Upon closing of the sale of Class B Stock on January 23, 2018, The [Victim] Family will receive the assigned multiple of 3.12 (inclusive of fees) of the one million eight hundred thousand dollar value they have locked via this process."

        b.     The sale discussed in the December 23, 2017 email did not take place as scheduled in January 2018. Instead, over the next several months, numerous lulling emails purportedly from Carmen Demarco were sent to V2 explaining the delays in the sale of Intellectual Properties to the Walt Disney Company, blaming the delays on scrutiny from the Department of Justice, and soliciting additional funds from victims.

        c.     For example, on or about March 29, 2018, BROWN and V2 received another purported email from Carmen Demarco stating, in part, "Hal [BROWN] asked that I render an opinion and also a thorough update today. He has been, is today and most likely will be through the day tomorrow on either standby with pre-meeting strategy session or on video conferences. ... Hal [BROWN] is being vetted (as the signatory to all unions) and being asked to prove (a) that ownership of the Intellectual Properties is in fact valid, which of course it is (b) that there was never nor is there now any collusion with the Walt Disney Company or any others leading to the purchasing of any of the Intellectual Properties (c) that all Intellectual Properties have complete international clearances so that they can be used in productions worldwide, which they of course do. ... The Oodles Company has set new deadlines for WDC and certainly WDC wants to adhere

to said deadlines. They will, we believe, close all by no later than the end of April if not sooner. They must do that in order to meet upcoming production deadlines."

      d. On or about April 17, 2018, BROWN and V2 received another purported email from Carmen Demarco stating, in part, "Hal, your summation of why Karin is going back to WDC is right on point …. She told me just within the last hour that she hears also that WDC is set to close by first of May. I just cannot see how they can accomplish even half of what they have in their sites without the content/IP's."

      e. On or about July 25, 2018, BROWN forwarded to V2 another purported email from Carmen Demarco stating, in part, "Wanted to keep you in the loop here … We're doing all we can to get the clearances locked so we can march on toward the 14th!!!." The email that BROWN forwarded to V2 stated, in part, "Please advise me by late this evening or early tomorrow of the yay or nay on whether or not you will send the additional funds to clear totally. Once cleared and August 14 date is locked then your paperwork will flow and really it is simple add-on to what has been agreed to already, with new amounts of course and new down line percentages. Go make it happen!!!"

      f. By the fall of 2018, the promised transaction still had not occurred. BROWN continued to lull victims and perpetuate the fraud by claiming that he was in the process of selling the purported intellectual property to a group of investors based in the United Kingdom. For example, on October 18, 2018, BROWN sent an email to someone referred to as Rich V. Rivera (RIVERA) at RVshamuone@groupmail.com[1] with the subject 'Tomorrow's Close!" The email stated, in part, "I do know what you all are going through and understand completely the complexities of obtaining financing of this amount from sources outside the US…. I know you

---

[1] This is an apparent reference to the Orca character made famous in numerous Sea World shows. BROWN claimed to victims that he had developed the content for various Sea World shows.

understand our frustrations as well. … We are frustrated with the process and the seemingly out of the blue delays. Your assurance that the funds will be in your account 'hopefully by the end of the day tomorrow but certainly no later than Monday' are appreciated….We ask, please, that you call us the moment those funds are in your account and are available."

   g. On October 24, 2018, BROWN sent an email to V1 with the subject "Keeping you informed." The email forwarded another email purportedly sent by an individual named Molly. BROWN's forwarding email stated, "This came in from Molly…they're really working at it. We're still at it here…going to be going until probably 11 pm or so and then we should be done!" The forwarded email stated, in part, "Hal, the trip to meet with 'the big boys' in person in NYC was fruitful in that there is now a plan top-down in place. I felt it necessary to do humanly doable to keep delays to a minimum and keep all moving forward. We all know certainly that closing something such as this is a gargantuan undertaking, mainly due to so many countries and regulators an overseers being involved at all levels."

   h. On or about November 18, 2018, BROWN sent V1 two pictures of what appear to be screenshots from a computer. The first photo, which is reproduced below, is of an Account Summary Overview for a First Republic Bank account, with the account number redacted. The "Statement Period" is for 11/11/18 – 11/12/18, and the account shows an 11/12 "Deposit [Pending]" of $846,000,000.00.



        i.     First Republic Bank has advised law enforcement that the purported statement sent to V1 was not genuine and did not reflect the records of First Republic. Among other things, First Republic reported that, "First Republic was unable to locate this attempted deposit or determine the account that received or attempted to receive the deposit of $846,000,000.00 on either 11/11/2018 or 11/12/2018."

        j.     On September 17, 2019, an associate of BROWN, a freelance artist who has done artwork for BROWN and OODLES since approximately 2008, was interviewed by law enforcement and advised that, in November, 2018, BROWN asked the associate to assist with a DECA[2] project for BROWN's daughter by creating company letterheads and documents. One of the documents this person created was the First Republic Bank Account Summary Overview dated November 12, 2018, noted above.

---

[2] According to the website deca.org, DECA Inc. is a 501(c)(3) not-for-profit student organization with more than 215,000 members. DECA prepares emerging leaders and entrepreneurs in marketing, finance, hospitality and management in high schools and colleges around the globe.

k. The second screenshot that BROWN sent to V1 was of a purported letter from Bray & Krais, dated November 17, 2018. According to their website, Bray & Krais is a specialist law firm with an outstanding reputation in music, sports, and entertainment. The letter states, "On Thursday, 25 October, 2018 a partnership of the six individuals of multi-national origins was formed in London for the stated purpose of transferring funds totaling Eight Hundred Forty Six Millions Dollars to a U.S. Partnership. These funds were stated to be used for the purchase outright of a U.S. Company to include all Intellectual Properties and digital platforms involved." The letter also states, "The wire transfer traversed through three intermediary financial institutions with conversion to U.S. Funds taking place upon arrival at the third. The amount of this transfer is indeed quite large and that in itself will always cause strict overview by many." The letter was signed but a name was not provided under the signature. Based on my knowledge of the investigation, I believe this letter was sent to explain why the "Pending" $846,000,000 deposit was never finalized and provided more excuses for delays. As with the First Republic Bank Account Summary Overview noted above, BROWN had his associate create a blank letterhead for Bray & Krais dated November 17, 2018, purportedly for BROWN's daughter's DECA competition.

l. On December 11, 2018, BROWN emailed V1 with the subject "Update with latest as of 7:30pm December 11, 2018." The email stated, "The good news is that we have now amassed an absolutely second-to-none collection of Intellectual Properties which are becoming more valuable by the month…we are now in the best position ever to sell quickly all or most of our Intellectual Properties. We have worked around the clock for the three weeks to complete this appraisal process and within the next two or three days, a division of Paramount will be verifying this appraisal and stating its validity." Later in the email is stated, "Had we used the profits to pay dividends instead of for the ongoing purchasing and clearing of Intellectual Properties, everyone

would have made very significant returns on their original investment...and those returns would be ongoing and increasing by 20% to 25% each year." The email continued, "There are two strong potential purchasers of at least 75% of our Intellectual Properties who want to come here to Asheville and meet everyone...They will be able to be here and have promised to do so next Wednesday, December 19th." Based on my knowledge and experience, BROWN discussed purchasing multiple Intellectual Properties and making them more valuable. BROWN also advised "we" are completing the appraisal of the Intellectual Properties, which will be verified by Paramount. BROWN advised that profits made were reinvested in adding additional Intellectual Properties, which reduced returns. I believe that Brown did not use profits from Oodles, if there even were any, to purchase intellectual properties as he represented and that the returns offered by BROWN were falsely overstated. This belief is corroborated by information received by law enforcement from the Internal Revenue Service indicating that it has no record of receiving any tax filings from Oodles during the relevant period.

  m. According to V1, there was a stockholder's meeting on December 16, 2018. During the meeting, BROWN discussed how Oodles set up a production business and should expect an appraisal of the Intellectual Property shortly. BROWN advised that the investors were to receive large dividends.

  n. BROWN provided V1 with a copy of a document labeled "Appraisal in full, Core Oodles Intellectual Properties," dated Tuesday, December, 18, 2018, with an email address attached as standardvorys@tutanota.com as the purported appraiser. The first page of the "appraisal," contained a description of the group performing the appraisal stating, "The free lance group has worked in the past with the teams of Vorys, Sater, Seymour, and Pease and now work independently." The appraisal listed 420 Intellectual Properties and claimed that the value of the

Intellectual Properties was millions of dollars. Vorys, Sater, Seymour, and Pease is a law firm based in Ohio with no offices in North Carolina or California.

    o. According to its website, the email service provider Tutanota claimed to be "the world's most secure email service" that does not log IP addresses and "no personal information such as phone numbers is required to access your anonymous email account," and is wholly based in Hanover, Germany.

    p. Based on your affiant's knowledge and experience, email services like Tutanota are not used to conduct legitimate business, and I therefore believe the user of standardvorys@tutanota.com is not licensed or qualified to conduct an appraisal of intellectual property. I further believe that a legitimate firm would use their letterhead and include a signature to verify the work performed.

    q. The appraisal also states, "All materials and valuation numbers have now been passed to Paramount for verification and statement of agreement which will come by December 19, 2018. Along with the appraisal, V1 received a document entitled "Statement of Verification and Agreement," dated December 19, 2018 on what appears to be Paramount Paramount letterhead. The opening line of the statement reads, "In the appraisal group operating under the guidance of Michael D. Armstrong and with values-confirmation gathered over a four-week period beginning November 14, 2018, all listed Intellectual Properties under the full and complete ownership of Oodles were vetted and all clearances domestically and internationally were confirmed. This took place with the help of the free-lance appraisers under the guidance of Vorys Firm." The statement concluded, "Note that it is the intention of Paramount and parent company Viacom to place a fair bid for a large portion and perhaps the entire catalogue of Intellectual Properties no later than January 18, 2019."

r. As part of this investigation, Paramount was asked to confirm the authenticity of the December 19, 2018 letter. A representative from Paramount advised the "Statement of Verification and Agreement" dated December 19, 2018 is not a document Paramount would produce and does not appear to be legitimate. The representative also advised that Paramount was not familiar with the Intellectual Properties and that Michael D. Armstrong had no involvement with Oodles. As with the First Republic Bank Account Summary Overview and Bray & Krais letterhead noted above, BROWN had his associate create a blank letterhead for Paramount dated December 19, 2019, purportedly for BROWN's daughter's DECA competition.

6. On or about September 6, 2019, a Verified Complaint and Motion for Preliminary Injunction was filed in the Superior Court of Buncombe County against BROWN and OODLES by Victim 3 (V3). Based on my review of V3's Verified Complaint and financial records, it appears that BROWN is continuing to engage in his fraudulent scheme and fraudulently utilizing money taken from V3 to make Ponzi payments to V1 and other victims.

a. According to the allegations of V3's Verified Complaint, in or about December 2018, V3 loaned $275,000 to BROWN and OODLES, which was purportedly secured with Preferred OODLES Stock. The loan terms were subsequently amended resulting in the provision of additional money from V3 on various occasion through June 2019. In total, V3 provided BROWN with approximately $755,000 pursuant to this loan. The maturity date of the loan was June 1, 2019, yet BROWN has not paid any money to V3. Your affiant believes that this loan is fraudulent inasmuch as OODLES is a sham entity utilized by BROWN in furtherance of his scheme.

b. According to the allegation of V3's Verified Complaint, in or about July 2019, BROWN also induced V3 to lend approximately $1.5 million to facilitate the purported sale

of intellectual properties ostensibly owned by OODLES to Apple. In exchange for V3's money, BROWN promised V3 a profit of approximately $3 million. In June and July 2019, V3 sent a series of wire transfers totaling approximately $1.5 million to a Sun Trust Bank Account *7069 held by BROWN d/b/a/ OODLES. Thereafter, BROWN provided V3 with a purported letter agreement between OODLES and Apple dated August 26, 2019 (Apple Agreement).

        c.     Based on your affiant's review of BROWN's correspondence with other victims, BROWN has used the same fraudulent premise set forth in V3's verified complaint, to wit, the purported sale of intellectual properties ostensibly owned by OODLES to well-known media companies in order to induce victims to provide him money. As with the other letterheads noted above, BROWN had the associate create a commitment letter and blank letterhead for Apple, purportedly for BROWN's daughter's DECA competition.

    7.     On or about September 10, 2019, another Verified Complaint and Motion for Preliminary Injunction was filed in the Superior Court of Buncombe County against BROWN and OODLES by Victim 4 (V4). Based on my review of V4's Verified Complaint and financial records, it appears that BROWN is continuing to engage in his fraudulent scheme and fraudulently utilizing money taken from V4 to make Ponzi payments to V1 and other victims.

        a.     According to the allegation of V4's Verified Complaint, in or about August 2019, BROWN induced V4 to lend approximately $5 million to facilitate the purported sale of intellectual properties ostensibly owned by OODLES to Apple. In exchange for V4's money, BROWN promised V4 a profit of approximately $9 million to be paid following the purported sale of the intellectual properties and associate distribution and production rights. BROWN also provided V4 with a copy of the fraudulent Apple Agreement. Thereafter, on or about August 25,

2019, August 29, 2019, and August 30, 2019, V4 conducted wire transfers totaling approximately $5 million to a Sun Trust Bank Account *7069 held by BROWN d/b/a OODLES.

    b. Based on your affiant's review of BROWN's correspondence with other victims, BROWN has used the same fraudulent premise set forth in V4's verified complaint, to wit, the purported sale of intellectual properties ostensibly owned by OODLES, in order to induce victims to provide him money.

    c. Your affiant has obtained and analyzed the *7069 account for the July and August 2019 time period. Based on my review, I have confirmed the incoming wire transfers from V4 and have also identified multiple suspicious transactions, including several over-the-counter withdrawals totaling approximately $329,627, and approximately $400,000 in Ponzi payments to V1.

## CONCLUSION

8. Your affiant submits that this affidavit supports probable cause for a warrant to arrest HAL H. BROWN JR. for wire fraud in violation of Title 18, United States Code, Section 1343 and money laundering in violation of Title 18, United States Code, Section 1957.

9. From at least the last several years to the present, BROWN with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writing, signal, and sound, to wit, the emails and wire transfers specified in Paragraphs four through seven above.

10. From at least the last several years to the present, BROWN did knowingly engage, attempt to engage, and caused others to engage, in monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposits, withdrawals, transfers and exchanges described in Paragraphs four through seven above, of United States currency, funds, and monetary instruments, such property having been derived from a specified unlawful activity, to wit, wire fraud.

Respectfully submitted,

Jacob R. Guffey
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 17th day of September, 2019.

HONORABLE DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE